# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 7

### OCTOBER TERM, A.D. 2014

### January 9, 2015

CHAD M. THOMAS,

Appellant
(Plaintiff),

v.

S-14-0110

JULIE M. SUMNER and NICOLE
ROSENBERGER,

Appellees
(Defendants).

*Appeal from the District Court of Natrona County*
*The Honorable W. Thomas Sullins, Judge*

*Representing Appellant:*
   Thomas S. Sutherland, Advanced Advocacy Attorney(s) At Law, Casper, Wyoming.

*Representing Appellees:*
   Richard H. Peek, Casper, Wyoming, for Appellee Julie M. Sumner. Billie LM Addleman and Khale J. Lenhart, Hirst Applegate, LLP, Cheyenne, Wyoming, for Appellee Nicole Rosenberger. Argument by Messrs. Peek and Lenhart.

*Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**FOX, Justice.**

[¶1]    Capt. Chad Thomas filed a defamation *per se* claim against his son's mother, Julie Sumner, and counselor, Nicole Rosenberger, alleging that they made defamatory statements in relation to a report and ensuing investigation of suspected child abuse.  The district court granted both the mother and counselor summary judgment.  Capt. Thomas appeals, alleging the counselor did not act in good faith under the child abuse reporting statute and thus is not entitled to immunity from civil liability.  He also alleges that the mother acted in bad faith in the course of the abuse investigation and therefore should not receive immunity, and that there are genuine issues of material fact that the mother's statements to parties outside the investigation constitute defamation *per se*.  We affirm.

### ISSUES

[¶2]    We restate the controlling issues as follows:

        1.   Did Ms. Rosenberger have reasonable suspicion of child abuse, entitling her to immunity under the Child Protective Services Act?

        2.   Is Ms. Sumner entitled to immunity under the Child Protective Services Act for her participation in the child abuse investigation?

        3.   Did Capt. Thomas present a genuine issue of material fact that Ms. Sumner made false statements to parties outside the scope of the child abuse investigation?

### FACTS

[¶3]    Capt. Chad Thomas and Julie Sumner are the biological parents of GT, born in 2002.  Capt. Thomas serves in the United States Air Force (USAF) and is stationed in Valdosta, Georgia; Ms. Sumner resides in Casper, Wyoming.  GT resides in Casper with Ms. Sumner, but spends part of his summers and some holidays in Georgia with Capt. Thomas pursuant to a visitation agreement between the parents.

[¶4]    During the Christmas 2010 visit with his father, GT communicated via telephone to his mother that Capt. Thomas was watching him take showers and washing him during his showers, including his genitals and buttocks.  When GT returned home from the Christmas visit, Ms. Sumner had GT speak with his counselor, Leslie Murtagh, about Capt. Thomas's conduct.  In May of 2011, Ms. Murtagh sent an e-mail to Capt. Thomas expressing her concern over his "supervision in monitoring [GT's] hygiene."  Capt. Thomas never responded to the e-mail.

[¶5]    At Ms. Sumner's deposition, when she was asked why neither she nor Ms. Murtagh ever reported to the appropriate authorities regarding Capt. Thomas's conduct,

1

she explained that while they both found the conduct inappropriate, it had only happened a couple times, and at that point it just seemed "kind of questionable, kind of weird, kind of iffy. . . . That's why [Ms. Murtagh] asked [Capt. Thomas] maybe at summertime could we not do the showering stuff."

[¶6]    During the summer 2011 visitation, when GT was nine years old, Capt. Thomas continued to watch GT shower and to wash his entire body, including his genitals and buttocks. Ms. Sumner received multiple phone calls from GT about Capt. Thomas's conduct. Capt. Thomas testified at his deposition that Ms. Sumner confronted him about the conduct.

> A. I told her that he didn't know how to take a shower. She asked me to not force him to take a shower everyday [sic]. She asked me not to use a washcloth and to not have him take a shower everyday [sic]. I told her that was not going to happen, that he would take a shower everyday [sic]. We argued about that. You know, when he's at your house, I guess you're going to have him dirty or, you know, whatever. When he's at my house, this is what we're going to do and, you know, that was that. She told me, well, I'm going to do something about it. And I guess this is what she did about it.
>
> Q. And by this you mean --
>
> A. Filing -- having something filed saying that I molested him.

[¶7]    In August of 2011, after GT returned from the summer visit, Ms. Sumner arranged for him to see licensed social worker Nicole Rosenberger. On August 17, 2011, at his first counseling session with Ms. Rosenberger, GT told her about Capt. Thomas using a washcloth to wash him, including his genitals and buttocks, and also watching him shower. The next day, Ms. Rosenberger reported GT's statements to the Valdosta, Georgia, Police Department, who then referred her to the USAF. Ms. Rosenberger testified, "To my knowledge, [GT] had made similar statements regarding bathing of his genitals to his mother and to the previous counselor prior to me."

[¶8]    After Ms. Rosenberger's initial report, allegations surfaced that Capt. Thomas digitally penetrated GT's anus while assisting him showering. The record does not reveal the source of those allegations. Ms. Rosenberger testified that she did not report the allegation and did not know its source. She further testified that Ms. Sumner did not make any such allegations to her.

2

[¶9]    While the provenance of the digital penetration allegation is unknown, the record indicates that it appeared some time shortly after Ms. Rosenberger's initial report.  In an undated Referral Form to the Children's Advocacy Center of Lowndes County [Georgia], Inc., the Air Force Office of Special Investigations (AFOSI) reported the following:

> On 23 Aug 11, ROBERT RAYMOND, Detective, Valdosta Police Department notified AFOSI Detachment 211, Moody AFB, GA of a possible child sexual assault.  Capt CHAD M.R. THOMAS (SUBJECT) was accused of indecent liberty with his 9 year old son [GT] (VICTIM) from Casper, WY.  SUBJECT washed VICTIM's genitals (which made him uncomfortable) and digitally penetrated VICTIM's anus with his finger, SUBJECT also watched VICTIM bathe on multiple occasions.

[¶10] Ms. Sumner admitted that GT told her about the bathing conduct and digital penetration over the telephone while on his summer 2011 visit with Capt. Thomas, and later when the child returned home.  However, she denied making the initial digital penetration report and was unsure when, and from whom, she first heard this allegation as part of the formal investigation, claiming it was either from Ms. Rosenberger or from USAF investigators.  She testified she only communicated to investigators the exact same information that had been conveyed to her from GT.  At his deposition, Capt. Thomas admitted he had no factual basis for his contention that Ms. Sumner made the digital penetration allegation to any law enforcement agents.

[¶11]  On September 15, 2011, Special Agent Alison Shapleigh from the AFSOI traveled to Casper to conduct a forensic interview of GT.  During that interview, GT confirmed that digital penetration occurred.  When Ms. Shapleigh asked GT how Capt. Thomas's conduct affected him he responded:

> [GT]:  Mad because he's touching my private parts.
>
> [Ms. Shapleigh]:  Okay, how, did, how else did you feel?
>
> [GT]:  I was feeling mad, upset and confused because, well I'm mad because he's washing me, sad because I don't get to wash myself and I'm confused because, I'm confused why Dad's even showing me how to shower.  I'm like, why can't you just let me shower my own way?

[¶12]  At his deposition, Capt. Thomas did not deny washing GT, including his genitals and buttocks, as well as supervising his showers.  He claimed GT did not know how to correctly wash himself and needed instruction.  He did, however, deny any allegations that he digitally penetrated GT's anus.

3

A. I gave him a shower. I am being accused of sexually molesting him by putting my finger up his -- his rectum and what I'm saying is that I didn't do that. So, I gave him a shower and that's probably the extent of using semantics and going around those words that I'm going to say.

Q. No. I understand that and I am not trying to trip you up with semantics. During the course of your showering, though, when you were using the washcloth, you did make contact with his genitals and buttocks?

A. I contacted every part of his body --

Q. Okay.

A. -- when I was giving him a shower.

[¶13] Details of the investigation into Capt. Thomas's conduct are not contained in the appellate record; however, the USAF authorities completed their investigation and concluded "[t]he preponderance of evidence does not support further action."[1]

[¶14] In July of 2012, Capt. Thomas filed his Verified Defamation Complaint, alleging that Ms. Sumner and Ms. Rosenberger "made intentionally malicious, slanderous, scurrilous and baseless allegations of sexual abuse" to Lowndes County law enforcement and USAF authorities. The complaint alleged that Ms. Sumner and Ms. Rosenberger knew of the falsity of their allegations, that "Defendants have repeated their slanderous statements . . . to a plethora of others," and that Ms. Rosenberger did not adequately investigate the matter before making her August 2011 report to local and USAF authorities in Georgia.

[¶15] In November 2013, after extensive discovery, and several pretrial hearings, Ms. Rosenberger and Ms. Sumner filed motions for summary judgment. In January 2014, the district court held a hearing on the motions, took the matter under advisement, and on February 27, 2014, issued its oral ruling granting summary judgment to both Ms. Rosenberger and Ms. Sumner. First, with respect to Ms. Sumner, the district court concluded she did not make any publication necessary for a defamation claim: "she spoke to [Ms.] Rosenberger, but only in the generalities of the report made by [Ms.] Rosenberger. She did not make any allegation to the investigators of the alleged defamatory conduct. She did answer questions to the Georgia authorities but made no

---

[1] Although the Air Force declined to pursue any administrative or disciplinary action against Capt. Thomas, it did note "some of the evidence provided in the [investigation] suggest[s] . . . it would be beneficial to review some of your parenting practices."

4

specific accusations that I could discern." Second, the district court stated that truth is an absolute defense to defamation under Wyoming law. The district court explained:

> [B]oth Defendants in this case, to the extent that there is any report, any slander attributed to them, made statements only of what [GT] told them. . . .
>
> And if you take a look at the deposition testimony and the exhibits, it was unrefuted that Plaintiff was watching [GT] shower, that Plaintiff was washing and helping [GT] clean himself, including private parts, and further, and what was most persuasive to me, is that [GT's] deposition testimony indicates that he was digitally penetrated in the anus during one of the showering events at least.

On this point, the district court concluded, "if that's the defamatory statement or statements attributed to them, then that was a truthful statement of what GT had, by deposition testimony, communicated to them." Third, with respect to Ms. Rosenberger, the district court found that her actions fell within the reporting requirements of Wyoming's Child Protective Services Act, Wyo. Stat. Ann. § 14-3-205(a) (LexisNexis 2013), and consequently she was entitled to the "broad" immunity protections of Wyo. Stat. Ann. § 14-3-209 (LexisNexis 2013). The district court concluded:

> "Applying [§ 14-3-209] to this case, it appears to me that the reporting of both Defendants was presumed to be made in good faith. . . . I simply cannot agree with the contentions on behalf of Plaintiff that [the report was] made in bad faith. There just is not evidence of bad faith that would defeat the good faith presumption in this case.

[¶16] Capt. Thomas timely filed his Notice of Appeal.

### STANDARD OF REVIEW

[¶17] Summary judgment is governed by W.R.C.P. 56(c):

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

5

"We review a district court's order on summary judgment *de novo*, using the same materials and following the same standards as the district court." *Herrera v. Phillipps*, 2014 WY 118, ¶ 8, 334 P.3d 1225, 1228 (Wyo. 2014); *see also Baker v. Speaks*, 2014 WY 117, ¶ 9, 334 P.3d 1215, 1219 (Wyo. 2014). We examine the record "'from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences which may fairly be drawn from the record.'" *Id.*, 2014 WY 117, ¶ 9, 334 P.3d at 1219 (quoting *Hasvold v. Park Cnty. Sch. Dist. No. 6*, 2002 WY 65, ¶ 11, 45 P.3d 635, 637-38 (Wyo. 2002)).

[¶18] The summary judgment movant bears the initial burden of establishing a *prima facie* case for summary judgment by showing that no genuine issue of material fact exists and that judgment should be granted as a matter of law. *Baker*, 2014 WY 117, ¶ 10, 334 P.3d at 1219. "A material fact is one that establishes or refutes an essential element of a cause of action or a defense asserted by a party." *McLaughlin v. Michelin Tire Corp.*, 778 P.2d 59, 63 (Wyo. 1989). If this initial burden is met, "the opposing party must present specific facts to demonstrate a genuine issue of material fact exists." *Alloway v. RT Capital, Inc.*, 2008 WY 123, ¶ 8, 193 P.3d 713, 715 (Wyo. 2008) (citing *Hatton v. Energy Elec. Co.*, 2006 WY 151, ¶ 9, 148 P.3d 8, 12 (Wyo. 2006)). We have explained:

> The evidence opposing a prima facie case on a motion for summary judgment must be competent and admissible, lest the rule permitting summary judgments be entirely eviscerated by plaintiffs proceeding to trial on the basis of mere conjecture or wishful speculation. Speculation, conjecture, the suggestion of a possibility, guesses, or even probability are insufficient to establish an issue of material fact.

*Jones v. Schabron*, 2005 WY 65, ¶ 11, 113 P.3d 34, 38 (Wyo. 2005) (internal quotation marks and citations omitted).

### *DISCUSSION*

**Wyoming's Child Protective Services Act**

[¶19] Wyoming has a strong public policy of protecting children from abuse or neglect, which the legislature has expressed in the Child Protective Services Act.

> The purpose of W.S. 14-3-201 through 14-3-216 is to delineate the responsibilities of the state agency, other governmental agencies or officials, professionals and citizens to intervene on behalf of a child suspected of being abused or neglected, to protect the best interest of the child, to further

6

> offer protective services when necessary in order to prevent any harm to the child or any other children living in the home, to protect children from abuse or neglect which jeopardize their health or welfare, to stabilize the home environment, to preserve family life whenever possible and to provide permanency for the child in appropriate circumstances. ***The child's health, safety and welfare shall be of paramount concern in implementing and enforcing this article.***

Wyo. Stat. Ann. § 14-3-201 (LexisNexis 2013) (emphasis added); *see also* Wyo. Stat. Ann. §§ 14-3-401 to -440 (LexisNexis 2013) (Child Protection Act).

[¶20] Our principal case applying the Child Protective Services Act, *Elmore v. Van Horn*, 844 P.2d 1078 (Wyo. 1992), reflects the legislature's strong policy of protecting children from abuse or neglect. In *Elmore*, after returning from visiting his father, MJ allegedly complained of pain in his buttocks area. *Id*. at 1080. His mother took him to a physician, who discovered redness in his anus area and concluded it could have a number of causes, from problems with bowel movements to abuse. *Id*. The physician recommended that MJ's mother take him to psychotherapy because he was exhibiting "bizarre" behavior. *Id*.

[¶21] Several months later, the mother took MJ to Gailene Van Horn, a licensed professional counselor. *Elmore*, 844 P.2d at 1080. The mother informed Ms. Van Horn that she was concerned about potential sexual abuse. *Id*. Ms. Van Horn conducted approximately seven sessions with MJ, at which point she began to have concerns that abuse was occurring. *Id*. After speaking to the Department of Family Services (DFS) about the process for reporting child abuse, Ms. Van Horn recommended that the mother report the potential abuse to DFS. *Id*. Ms. Van Horn did not make the report herself. *Id*.

[¶22] Later, an attorney representing the mother in a custody dispute brought an affidavit to Ms. Van Horn's office which stated, "[MJ] has revealed information to me which supports the conclusion that sexual abuse has been occurring to him during visits to his father in Gillette, Wyoming." *Elmore*, 844 P.2d at 1080. Ms. Van Horn signed the affidavit, which was used at a show cause hearing to deny the father visitation. *Id*. at 1080-81. Eventually, in the ongoing custody dispute, the trial court concluded, "[Ms.] Van Horn lied to the Court under oath either in her affidavit of July 18, 1988, or today . . . . Because of that and because there is no independent corroboration of her testimony, the Court finds it to be entirely without merit and disregards it entirely." *Id*. at 1081. Ms. Van Horn admitted that she did not read the affidavit as closely as she should have. *Id*. The father won custody and then sued Ms. Van Horn. *Id*. The case was dismissed on summary judgment because Ms. Van Horn qualified for immunity under the Child Protective Services Act.

[¶23]  On appeal, this Court treated Ms. Van Horn as a reporter under Wyo. Stat. Ann. § 14-3-205, and concluded that her actions entitled her to immunity under § 14-3-209. *Elmore*,  844 P.2d at 1083.  We held:

> W.S. 14-3-209 provides immunity, though negligence may be involved in reporting, for the report may still be made in good faith. The material facts found in affidavits and evidence presented when considered in a light most favorable to appellants establish at most negligence which is insufficient to overcome the statutory presumption . . . of good faith.

*Id*.

[¶24]  Later, in *May v. Southeast Wyoming Mental Health Center*, 866 P.2d 732 (Wyo. 1993), we confronted a similar fact pattern: parents were separated and their three-year-old daughter exhibited signs of discomfort in her genital area following visits with the father. *Id*. at 734.  The mother took the child to a therapist, and the child, limited by the experience and vocabulary of a three-year-old, described what the therapist interpreted as sexual abuse. *Id*.  The therapist reported the abuse, visitation was suspended, and an investigation ensued. *Id*.  Eventually charges were filed against the father for sexual abuse, but later the child recanted her statements, and the charges were dropped. *Id*. at 735.   The father responded with a civil suit against the mother, the therapist, the Department of Family Services, and several other professionals involved in the abuse investigation.   The district court dismissed the claim against several parties, and the remaining parties were granted summary judgment. *Id*. at 736.   On appeal this Court affirmed summary judgment for all appellees, relying on the good-faith immunity provided in § 14-3-209, and explaining:

> The reason for this blanket immunity is to protect children by encouraging reporting of suspected abuse so it can be investigated without the reporter fearing reprisal if the suspicions are later determined to be unfounded.

*May*, 866 P.2d at 738.

[¶25]  The reporting and immunity statutes in Wyoming's Child Protective Services Act may have the potential of depriving those wrongfully accused of child abuse or neglect of a remedy.   However, the legislature has clearly expressed its determination that protection of vulnerable children outweighs that concern.[2]  In *Elmore*, we acknowledged this tension between the rights of children and adults:

---

[2] The reporting statute is not without some limitations.  Wyo. Stat. Ann. § 14-3-205(d) does make it a misdemeanor for "[a]ny person" to "knowingly and intentionally" make "a false report of child abuse or

> [W]e are obligated to honor the determination of the Legislature that protection of one innocent segment of society warrants occasional injury to another. The mute and powerless victims of child abuse have long suffered at the hands of their tormenters. Society's protective voice, the Legislature has found, has been silenced by the fear of retaliation. The protection of the young victims, the Legislature has determined, requires that uncompensated injury occasionally result to an adult.

*Elmore*, 844 P.2d at 1084 (quoting *Thomas v. Chadwick*, 274 Cal.Rptr. 128, 138 (Cal. Ct. App. 1990)); *see also City of Laramie v. Hysong*, 808 P.2d 199, 204 (Wyo. 2001), (follow-up on child abuse report was sufficient exigent circumstance to justify warrantless entry), *abrogated on other grounds by Georgia v. Randolph*, 547, U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006).

[¶26] In light of the "paramount concern" for child protection underlying the Child Protective Services Act, "the Wyoming legislature has adopted a statutory scheme which requires reporting and protects those who report child abuse." *Elmore*, 844 P.2d at 1082; *see also* Wyo. Stat. Ann. § 14-3-201. Reports of child abuse are to be made as follows:

> Any person who knows or has reasonable cause to believe or suspect that a child has been abused or neglected or who observes any child being subjected to conditions or circumstances that would reasonably result in abuse or neglect, shall immediately report it to the child protective agency or local law enforcement agency or cause a report to be made.

Wyo. Stat. Ann. § 14-3-205(a).

[¶27] On its face, the language of § 14-3-205(a) indicates that the reporting requirement is applicable to "any" person—the provision does not distinguish between professionals, social service providers, parents, or other members of the public. Section 14-3-205(a) also plainly states that reporting "shall" be made "immediately," if one "knows or has reasonable cause to believe or suspect that a child has been abused or neglected." Notably, the plain language of § 14-3-205(a) does not require that the reporting party know that a child has been abused, or even reasonably believe that the child was abused;

---

neglect, or who encourages or coerces another person to make a false report . . . ." Capt. Thomas does not rely on this provision.

9

instead, a report can be made based on a minimum threshold of reasonable suspicion. Taking into account the purpose of the Child Protective Services Act, and § 14-3-205(a)'s imperative language urging reporting,[3] it is clear the legislature intended § 14-3-205(a) to encourage reporting in the absence of complete certainty and without fear of sanction, even for reports that are ultimately unsubstantiated. *See May*, 866 P.2d at 738.

[¶28]  That intent is reinforced by the qualified immunity from criminal or civil action the Act provides to reporters:

> Any person, official, institution or agency participating in good faith in any act required or permitted by W.S. 14-3-201 through 14-3-215 is immune from any civil or criminal liability that might otherwise result by reason of the action. For the purpose of any civil or criminal proceeding, the good faith of any person, official or institution participating in any act permitted or required by W.S. 14-3-201 through 14-3-215 shall be presumed.

Wyo. Stat. Ann. § 14-3-209.  The language of the immunity statute is unambiguous—it applies to "[a]ny person . . . participating in good faith in any act required or permitted" under the Child Protective Services Act.  *May*, 866 P.2d at 738.  To further encourage reporting without fear of civil or criminal reprisal, § 14-3-209 "provides a [statutory] presumption that the report was made in good faith absent any contrary allegation or showing from appellants."  *Elmore*, 844 P.2d at 1083.  The burden is on the party attempting to rebut the presumption to come forward with admissible evidence sufficient to show bad faith, and showing negligence is not sufficient to overcome the good-faith presumption.  *Id*.  If the burdened party fails to rebut the good-faith presumption, the statutory presumption remains intact, and the defendant is entitled to judgment as a matter of law.  *See Howe v. Andereck*, 882 So.2d 240, 245 (Miss. Ct. App. 2004) (citing *Lehman v. Stephens*, 499 N.E.2d 103, 112 (Ill. App. Ct. 1986)) (Mississippi's immunity statute also presumes good faith in reporting).

---

[3] In spite of § 14-3-205(a)'s mandatory-type language, it is a permissive reporting statute because "[a]ll persons who report . . . do not face a criminal penalty if they fail to report child abuse." *Elmore*, 844 P.2d at 1083.

## I. *Did Ms. Rosenberger have reasonable suspicion of child abuse, entitling her to immunity under the Child Protective Services Act?*

[¶29] In order to qualify for reporter immunity under the Child Protective Services Act, two basic requirements must be met: "First, the report must be made pursuant to W.S. 14-3-205, which requires that a person immediately report abuse if they 'kno[w] or ha[ve] reasonable cause to believe or suspect' that abuse has or is occurring, and second, that the reporter be acting in good faith." *Elmore*, 844 P.2d at 1083 (citing Wyo. Stat. Ann. § 14-3-209). The minimum threshold for reporting child abuse or neglect under Wyo. Stat. Ann. § 14-3-205(a) is "reasonable cause to . . . suspect" abuse. With this threshold for reporting in mind, our task is to consider whether Capt. Thomas presented a genuine issue of material fact that Ms. Rosenberger did not act with reasonable suspicion in making her report.

[¶30] In her memorandum in support of motion for summary judgment, Ms. Rosenberger asserted the following relevant facts: (1) at her first counseling session with GT, he told her about Capt. Thomas touching his genitals and buttocks, and watching him shower; (2) she was concerned with Capt. Thomas's conduct and suspected abuse may have occurred; (3) after that first session, she reported her suspicions to the Valdosta, Georgia, Police Department and the USAF; (4) she did not report "digital penetration" to law enforcement; (5) and she did not conduct any further investigation into the suspected abuse prior to making her report. She claimed these facts were sufficient for her to report under § 14-3-205(a) and absent a showing of bad faith, qualified her for immunity under § 14-3-209.

[¶31] In order to determine whether Ms. Rosenberger had the requisite reasonable suspicion to make her report, we must interpret "reasonable cause to . . . suspect" under § 14-3-205(a). We therefore resort to our well-established rules for interpreting statutory language.

> We endeavor to interpret statutes in accordance with the legislature's intent. We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. We construe the statue as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute *in pari materia*. When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction. . . .
>
> . . .

> Whether a statute is ambiguous is a question of law. A statute is unambiguous if reasonable persons are able to agree as to its meaning with consistency and predictability, while a statute is ambiguous if it is vague or uncertain and subject to varying interpretations.

*MF v. State*, 2013 WY 104, ¶ 8, 308 P.3d 854, 857 (Wyo. 2013) (quoting *Rock v. Lankford*, 2013 WY 61, ¶ 19, 301 P.3d 1075, 1080-81 (Wyo. 2013)).

[¶32] First, we look to the language at issue, "reasonable" and "suspect." These words are not defined in the Child Protective Services Act. "In the absence of a statutory definition, this Court infers that the legislature intended no special meaning for the word but, instead, intended that it be given its ordinary meaning—its common dictionary definition." *Craft v. State*, 2012 WY 166, ¶ 14, 291 P.3d 306, 310 (Wyo. 2012) (citing *Ewing v. State*, 2007 WY 78, ¶¶ 10, 13, 157 P.3d 943, 946 (Wyo. 2007)).

[¶33] The common meaning of "reasonable" is "being or remaining within the bounds of reason : not extreme : not excessive : rational." Webster's Third New International Dictionary 1892 (2002). Black's Law Dictionary 1265 (6th ed. 1990) defines "reasonable" as "[f]air, proper, just, moderate, suitable under the circumstances."

[¶34] The common meaning of "suspect" is "to imagine to be guilty without proof: surmise." The Merriam-Webster Dictionary 721 (2004). Black's Law Dictionary 1446 (6th ed. 1990) defines "suspect" as "[t]o have a slight or even vague idea concerning—not necessarily involving knowledge or belief or likelihood."

[¶35] Wisconsin has considered the meaning of "reasonable suspicion" in the context of its child abuse reporting statute, and concluded that the term is unambiguous and not subject to misunderstanding. *State v. Hurd*, 400 N.W.2d 42, 45 (Wis. Ct. App. 1986).

> [U]se of the phrase "reasonable cause to suspect" fairly notifies a person of ordinary intelligence that if there is a reasonable basis to suspect that child abuse has occurred, that person must make a report to the appropriate agency. Whether a person possesses a reasonable suspicion that child abuse has occurred is not subject to misunderstanding. This requirement examines the totality of the facts and circumstances actually known to, and as viewed from the standpoint of, that person. Thus, the test becomes whether a prudent person would have had reasonable cause to suspect child abuse if presented with the same totality of circumstances as that acquired and viewed by the defendant.

*Id*. at 45 (internal citations omitted).

[¶36] Capt. Thomas argues that it was unreasonable for Ms. Rosenberger to make her report after one session with GT, especially when she was aware that GT made similar reports about Capt. Thomas's washing conduct to his previous counselor, Ms. Murtagh. He also contends that Ms. Rosenberger acted unreasonably by failing to recognize that Ms. Sumner was using Ms. Rosenberger's counseling services as a pretext for an ongoing custody dispute. He claims Ms. Rosenberger should have asked GT whether his washing disclosures were coerced in order to modify custody and visitation. Capt. Thomas also makes vague claims that Ms. Rosenberger confused her role as a therapist, instead acting as a forensic interviewer in her first counseling session with GT.[4]

[¶37] All of these contentions are essentially allegations that Ms. Rosenberger was negligent. This Court has previously found that negligence is insufficient to overcome the statutory presumption of good faith under § 14-3-209. *Elmore*, 844 P.2d at 1083. Capt. Thomas's insistence that Ms. Rosenberger had a duty to investigate further prior to reporting not only disregards the statutory requirement to "immediately report" suspected abuse, but would contravene the purpose of the act, to encourage reporting without fear of reprisal. *See May*, 866 P.2d at 738.

[¶38] The uncontroverted facts demonstrate that Ms. Rosenberger made her report with at least reasonable suspicion. GT told Ms. Rosenberger that his father watched him shower, and that he touched GT's genitals and buttocks while assisting him with his showers. GT's statements were enough to arouse suspicion in Ms. Rosenberger, and she reported the information immediately. Her response to GT's disclosures was within the bounds of reason; the information was sufficient for her to suspect abuse had occurred; and she acted immediately on that information, which is required by the reporting statute. Capt. Thomas identified no genuine issue of material fact that Ms. Rosenberger lacked the requisite reasonable suspicion to make her report.

[¶39] When a person has "reasonable cause to . . . suspect that a child has been abused or neglected" under § 14-3-205(a), then that person acts in good faith within the meaning of § 14-3-209. *See Marks v. Tenbrunsel*, 910 So.2d 1255, 1261 (Ala. 2005) (concluding that under Alabama's permissive reporting statute, when a reporter makes a report based on reasonable cause to suspect abuse, they are acting in good faith); *O'Heron v. Blaney*, 583 S.E.2d 834, 836 (Ga. 2003) (addressing Georgia's mandatory reporting statute, "Once reasonable cause has been established under this standard, a reporter . . . is, by definition, operating in good faith."). Because we conclude that Ms. Rosenberger acted

---

[4] Capt. Thomas presents an article on forensic interviewing, but does not provide sufficient foundation connecting the article to Ms. Rosenberger's actions as a licensed social worker. She was not acting as a forensic interviewer in relation to GT.

upon a reasonable suspicion, and Capt. Thomas failed to rebut the presumption of good faith with his negligence allegations,[5] we conclude that Ms. Rosenberger is immune from civil or criminal liability. Her motion for summary judgment was appropriately granted as a matter of law.

## II. *Is Ms. Sumner entitled to immunity under the Child Protective Services Act for her participation in the child abuse investigation?*

[¶40] As noted above, *see supra* ¶ 28, § 14-3-209 provides civil and criminal immunity to "[a]ny person, official, institution or agency participating in good faith in any act required or permitted" under the Child Protective Services Act. The broad scope of this immunity is not limited to reporters, but includes other parties who participate in "any act required or permitted" under the Child Protective Services Act, including ensuing investigations. Wyo. Stat. Ann. § 14-3-209; *see also May*, 866 P.2d at 738 (providing blanket immunity to the reporter as well as those involved in the investigation). Accordingly, Ms. Sumner is immune for any statements she made while cooperating with the investigation unless Capt. Thomas is able to overcome the presumption of good faith by demonstrating a genuine issue of material fact exists that Ms. Sumner acted in bad faith, which we defined in *Elmore*, 844 P.2d at 1083, as acting with a malicious motive or making deliberately false accusations.

[¶41] Capt. Thomas contends that "both the Appellees are not being truthful about not making the digital penetration report . . . . The bottom-line is that somebody is lying about the contents of the reports made and lying demonstrates bad faith." The substance of his argument is that somebody must have made the digital penetration report to the Valdosta Police Department, and if Ms. Rosenberger did not make those initial digital penetration allegations, then Ms. Sumner must have. He contends that Ms. Sumner is lying and acting in bad faith in denying that she is the source of those allegations.

[¶42] Ms. Sumner admitted to speaking with Air Force investigators about Capt. Thomas's conduct toward GT, but claimed she always qualified her statements as being restatements of what GT had reported to her. She admitted that GT disclosed to her the washing conduct and the digital penetration allegation over the phone while he was visiting Capt. Thomas. Nevertheless, in her deposition she denied making the initial digital penetration report, claiming it arose either from Ms. Rosenberger or from USAF investigators. While Capt. Thomas doubts the veracity of this testimony, at his deposition he admitted he had no factual basis for his contention that Ms. Sumner made

---

[5] Capt. Thomas makes a number of unsubstantiated allegations of bad faith toward Ms. Rosenberger, such as "her failure to talk to GT for greater than a few minutes in a single session prior to her report, her desire to destroy [his] military career," and cryptic references to her counseling notes. He provides no evidence beyond accusation, and we therefore decline to consider these arguments. *See Jones*, 2005 WY 65, ¶ 11, 113 P.3d at 38 ("Speculation, conjecture, the suggestion of a possibility, guesses, or even probability are insufficient to establish an issue of material fact.").

14

the digital penetration allegations to any law enforcement agents. "Statements of unsubstantiated belief do not create a genuine issue of material fact precluding summary judgment." *Gillett v. White*, 2007 WY 44, ¶ 18, 153 P.3d 911, 916 (Wyo. 2007).

[¶43] Capt. Thomas did not provide the records or testimony of the investigators that may or may not have provided evidence supporting his suspicions. The absence of evidence coupled with speculation does not create a genuine issue of material fact. *See Jones*, 2005 WY 65, ¶ 11, 113 P.3d at 38 ("Speculation, conjecture, the suggestion of a possibility, guesses, or even probability are insufficient to establish an issue of material fact.").

[¶44] At various other places in his brief, Capt. Thomas alleges that Ms. Sumner made a second report of emotional and/or physical child abuse to USAF authorities, even though Ms. Sumner denied any knowledge of two separate investigations. Although he argues strenuously that this second report was malicious, again he provides no evidence other than conclusory allegations and accusations that Ms. Sumner initiated the second investigation. Conclusory statements or mere opinions are insufficient to satisfy the nonmovant's burden in opposition to summary judgment. *Downen v. Sinclair Oil Corp.*, 887 P.2d 515, 519 (Wyo. 1994).

[¶45] Capt. Thomas also alleges Ms. Sumner acted maliciously because the abuse reports were a pretext for visitation modification. It is true that Ms. Sumner attempted to modify visitation once she discovered Capt. Thomas's washing conduct, but Capt. Thomas has provided nothing more than speculation that Ms. Sumner fabricated the abuse in order to modify visitation.

[¶46] Lastly, Capt. Thomas alludes to a number of other instances which he argues require a reasonable inference in his favor, and thus create genuine issues of material fact that Ms. Sumner acted in bad faith.[6] Because these allegations are unsupported by facts or cogent legal argument, we will not address them. *See Ortiz v. State*, 2014 WY 60, ¶¶ 84-85, 326 P.3d 883, 900 (Wyo. 2014). Capt. Thomas has presented us with no genuine issue of material fact that Ms. Sumner acted in bad faith in her participation in the abuse investigation, and she is therefore immune from liability for her statements made to investigators.

---

[6] For example, he states "Ms. Sumner's malicious intent/bad faith have been exhibited via a number of areas, for example, her threats to exact vengeance, her counselor shopping for a counselor willing to make a child abuse report, her repeated 'conversations' with investigators, her tandem use of the civil and criminal arms of legal system to gain advantage in her custody case, etc." These unsupported allegations do not create a genuine issue of material fact.

### III. Did Capt. Thomas present a genuine issue of material fact that Ms. Sumner made false statements to parties outside the scope of the child abuse investigation?

[¶47] Ms. Sumner admitted to mentioning the abuse investigation to her mother, one of her friends, her aunt, and an indeterminate number of clients at the salon where she works. She further stated that the only detail she ever disclosed to a non-investigating party was that Capt. Thomas had watched GT shower and that he was being investigated for abuse. She contends that any communications she made to any parties were simply truthful restatements of information that GT disclosed to her.

[¶48] Ms. Sumner's statements to parties outside the scope of the abuse investigation are not protected by the Child Protective Services Act's immunity statute, and therefore we analyze those communications under Capt. Thomas's defamation *per se* claim.

[¶49] In *Hoblyn v. Johnson*, 2002 WY 152, ¶ 41, 55 P.3d 1219, 1233 (Wyo. 2002), this court defined defamation *per se*.

> Defamation per se means a statement which is defamatory on its face and, therefore, actionable without proof of special damages. The only statements classified as defamatory per se or damaging on their face, and which therefore do not require proof of special harm, are those which impute (1) a criminal offense; (2) a loathsome disease; (3) a matter incompatible with business, trade, profession, or office; or (4) serious sexual misconduct.

(Internal citations and quotation marks omitted.) While a defamation *per se* claim does not require proof of pecuniary or economic loss, it does require a *prima facia* showing that: (1) the defendant made a false and defamatory communication concerning the plaintiff; and (2) the defendant made an unprivileged publication to a third party; and (3) at the time of the publication the defendant knew the communication was false, or the defendant acted in reckless disregard of whether the statement was false; or the defendant acted negligently in failing to ascertain whether the communication was false. Restatement (Second) of Torts § 558 (1977); *see also Tschirgi v. Lander Wyoming State Journal*, 706 P.2d 1116, 1119-20 (Wyo. 1985) (discussing the requirement that defamatory communication be false); *Lever v. Community First Bancshares, Inc.*, 989 P.2d 634, 638 (Wyo. 1999) (discussing privilege as related to defamatory communications); *Blake v. Rupe*, 651 P.2d 1096, 1107 n.9 (Wyo. 1982) (adopting Restatement (Second) Torts § 577 definition of publication as "communication intentionally or by a negligent act to one other than the person defamed").

[¶50] In *Tschirgi*, this Court held that communications that are "substantially true" are a complete defense to a defamation action for libel. We explained, "it is not necessary to

16

prove the literal truth of the accusation in every detail, and that it is sufficient to show that the imputation is substantially true, or, as it is often put, to justify the gist, the sting, or the substantial truth of the defamation." *Tschirigi*, 706 P.2d at 1120 (internal quotation marks omitted). Ms. Sumner testified that she did not provide any details of the investigation to parties not involved in the investigation, but only mentioned to them that Capt. Thomas was being investigated for abuse and that he had watched GT shower. Capt. Thomas admits he watched GT shower, he washed him, and he was indeed investigated for abuse. Other than making unsupported allegations that Ms. Sumner spread "malicious, slanderous, scurrilous and baseless allegations of sexual abuse," Capt. Thomas presents no genuine issue of material fact that Ms. Sumner made false statements to any third parties. The only evidence in the record is that Ms. Sumner's communications were truthful. We can draw no inferences favorable to Capt. Thomas from these facts, and because truth is an absolute defense to defamation claims, we agree with the district court that Ms. Sumner is entitled to summary judgment as a matter of law.

## *CONCLUSION*

[¶51]  Capt. Thomas has not demonstrated a genuine issue of material fact exists with respect to immunity under the reporting statute or to defamation. Affirmed.